

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0967-15

**GENARO GALVAN ACOSTA, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

**ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE THIRTEENTH COURT OF APPEALS
LIVE OAK COUNTY**

**JOHNSON, J., filed a concurring opinion in which ALCALÁ, J., joined.**

### C O N C U R R I N G   O P I N I O N

This Court has rejected the "divide and conquer" analysis in sufficiency challenges,[1] but such a position does not give free rein to courts to rely on assertions that any and all conduct displayed by a suspect constitutes "consciousness of guilt." The court of appeals was at least partially correct in pointing out that some of the "incriminating" evidence has no clear association with criminal activity.

The opinion of the Court sets out twelve circumstances that it maintains show appellant's

---

[1] *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

affirmative links to criminal activity. Some of the twelve circumstances have a potential to do that, but some apply to many drivers that have no connection to criminal activity, and for most of those circumstances, no explanation of why they were clear indicators of an affirmative link to the contraband was given.

1.

The officers testified that appellant was "unusually" nervous and jittery.[2] Most motorists who are stopped by law enforcement will be nervous to some degree; such persons include me and my husband, a retired police officer. And appellant was stopped while driving on an invalid license and having numerous outstanding tickets and carrying passengers who were in violation of seat-belt laws. This is a maybe/maybe not indicator.

2.

I am unable to discern why the circumstance of "he would not stop talking" is an indicator of guilt. Some people talk when they are nervous, others clam up.[3] We are not given much insight

---

[2] Q. You also testified that you were trained as to what's considered "ordinary" on a traffic stop versus what's not considered ordinary?
A. [Trooper Prado] Yes, ma'am.
Q. Is it ordinary for someone to become nervous?
A. Yes.
2 R.R. 94.

[3] Q. And when someone is nervous they display signs of jittery or their voice shakes or things like that?
A. [Trooper Prado] Yes.
Q. And when somebody is nervous they sometimes talk too quickly?
A. Yes.
Q. And sometimes people talk a lot when they're nervous?
A. Yes.
2 R.R. 94.

Trooper García, the more experienced officer, was more explicit.
Q. Would the degree of nerves that was displayed by Mr. Acosta, how would you relate that to normal nervousness by someone that's pulled over for a traffic stop?
A. The nervousness he displayed on this day is not normal. On this particular day we probably stopped anywhere from five to eight cars, maybe ten before this one. So we actually encountered ten drivers before this

into what appellant said, or how much, except for two dissimilar translations of a statement that is described as "arguably incriminating."

### 3.

Testimony indicated that appellant and his wife gave inconsistent answers when interviewed separately, but the nature of those inconsistencies is not in the record. The only testimony in the record about such inconsistencies is that one officer thought that the owner was a sister-in-law and the other thought that she was a niece.

### 4.

The "arguably incriminating statement," spoken in Spanish, was translated in two ways. In one translation, the statement could reasonably be taken as incriminating; "I'll give myself up if you don't arrest my family." The other translation is less clear; "If I take the fall will you let them go?" In English, "taking the fall" is shorthand for admitting guilt while not being guilty of the act alleged. From the second statement, one could reasonably conclude that appellant, although not actually knowing that the marijuana was in the tire, was willing, for whatever reason, to take the blame. Other suspects have done the same for many reasons. Depending on which translation was used as the basis for a juror's conclusion and what inferences were drawn from that translation, the statement could be taken as evidence of guilt, or not.

### 5.

Since when is having only one key on a key ring (and a clean car) indicative of criminal

---

one, and this one was different.
2 R.R. 125.

4

activity?[4] When one buys a car, the single key comes on a key ring, often with a remote locking device. Vehicles usually come with more than one key, but the duplicate keys are generally on separate rings. The last time I had more than one key on my car key ring was when, in the past, a separate key was needed to open the trunk. Without evidence supporting an assertion that only criminals keep only one key on the key ring for a car, this "circumstance" has no relevance.[5]

6.

Because the car was borrowed, the possibilities include both knowledge of contraband and no knowledge of contraband. An interesting side-note is that both troopers testified that the owner was never precisely identified and that their investigation went no further than appellant.[6]

7.

Appellant was carrying $300 in cash, and it is asserted in the opinion of the Court that he and his wife were unemployed. Trooper Prado testified that he did not ask appellant about employment.

---

[4] Q. What else did you notice about the vehicle or the condition of the passengers?
  A. [Trooper Prado] The vehicle itself was pretty clean, you know, didn't look like it had been dirty, all carpets were clean, single key in the ignition, just stood out because most cars aren't that clean.
  Q. And the single key in the ignition, how unusual is that?
  A. It's actually very unusual, because for the normal commuter we tend to put our house keys on there and keys to a door of some sort, we do that. It's nature.
2 R.R. 74.

[5] Trooper Prado conceded on cross-examination that having only one key on a key ring would not be unusual.
  Q. And if I were to borrow your car, that one [the DPS vehicle] or your personal car, you wouldn't expect me to put my house key on it, would you?
  A. No.
  Q. It would make more sense to keep your property, your car, that key separate from the rest of my keys?
  A. Yes.
  Q. So that's not unusual?
  A. No, I guess not.
2 R.R. 96.

[6] Q. Who did it belong to?
  A. [Trooper García] I believe his niece. I don't know the exact name, but it didn't come back to him.
  Q. Did y'all ever try to interview the owner of the vehicle?
  A. No.
2 R.R. 134.

When challenged by the state, he revised that assertion, but gave no indication as to how he knew that appellant was unemployed. 2 R.R. 75.[7] He did agree that appellant had a disabled child and that the $300 could be connected to that fact.[8]

Trooper García also testified about the stop and arrest. At trial, he was not even asked if any inquiry had been made about appellant's employment. Thus the record does not appear to adequately support an allegation that appellant was unemployed.

8.

Another circumstance asserted to support probable cause is the presence of a Santa Muerte charm in appellant's wife's purse. Based on that charm, the state argued that, because Santa Muerte is the "patron saint of drug traffickers," appellant must be a drug trafficker.[9] The charm would be

---

[7] Q. Did you discern if either Mr. Acosta or his wife were employed?
A. I don't believe I did.

Later, his testimony was revised.

Q. [the state] Trooper Prado, on the break did you have an opportunity to go over your report?
A. Yes, sir.
Q. And specifically just the portion regarding the employment of Mr. Acosta and his wife?
A. Yes, sir.
Q. Did your investigation reveal whether they were employed or unemployed?
A. They were unemployed.
2 R.R. 90-91.

There is no explanation of when and how Trooper Prado received employment information.

[8] Q. So it's possible he could have also received a disability check for his son?
A. Yes, ma'am.
Q. And that could explain the $300?
A. Yes, ma'am.
2 R.R. 97.

[9] A. [Trooper Prado] At the scene, as far as religious artifacts, we saw the Bible on the dashboard, and then later during the search we found what I believed to be good luck charms inside Mr. Acosta's wife's purse.
Q. What was that?
A. They are what are called the "Santa Muerte".
Q. And in your experience and training what is that?
A. She's supposed to bring good luck and faith and guidance to people, and she's worshipped [sic] I guess by

marginally more relevant if it had been found in appellant's pocket, but even then it would be only marginally relevant. The cult of Santa Muerte seems to be derived from the religious practices of the indigenous pre-Columbian peoples, such as Mayas and Aztecs, and is one of the fastest growing religions in the world, estimated to have from 3 to 12 million adherents. She is the second most popular saint in Mexico, after Saint Jude. The cult first became well known in 1998, when Mexican police arrested a notorious criminal and found a shrine to Santa Muerte in his home. This led to a folk "wisdom" that Santa Muerte is the patron saint of criminals. Today in Mexico City, there are a number of public shrines to Santa Muerte. *See*, *La Santa Muerte, skeleton saint popular among those in drug trade, gaining popularity in U.S.*, NEW YORK DAILY NEWS (Mar. 4, 2013), http://nydailynews.com/news/national/la-santa-muerta-skeleton-saint-popular-drug-trade-gaining-popularity-u-s-article-1.1278774.

To say that appellant is a drug trafficker because his wife was carrying a Santa Muerte charm is similar to saying that a person who is carrying a medal depicting Saint Jude, the patron saint of desperate cases and lost causes, must be terminally ill or that a person carrying a dried four-leafed clover must be Irish.

9.

---

the human—people who human smuggle or drug traffic.
2 R.R. 75-76.

Q. And when—did you have the opportunity to notice anything that was in Maria Guerrero's purse that was of significance?
A. [Trooper García] Yes, she had a lot of saints that people I guess believe in, some for narcotics trafficking, some for money, some to get them from point A to point B, something that's consistent with drug trafficking, and it was in her purse.
2 R.R. 127-28.

The "herbs" found in appellant's vehicle were freshly cut branches with leaves and could have been easily identified by a botanist, but the plants were never identified and could have been anything from poison ivy to dill to squash leaves to young leaves from any number of common plants. Nothing in the record reveals what plant they were from, and therefore the witnesses could not accurately testify that the herbs were used for good luck, only that the plant material was in the vehicle.[10] The testimony of the troopers reflects their apparent belief that any plant material in a vehicle is a religious symbol used exclusively by criminals.

10-12.

It is recited in three separate "circumstances" that the tire was too clean, there was lubricant on the rim, and that the tool marks indicated that the tire-retention mechanism had been lowered

---

[10] Q. What type of plants are considered the good luck symbol?
A. [Trooper Prado] It's like -- name of it is -- I have it -- I'm not entirely sure what the name of the plant is. We saw pictures of it, and you can relate the pictures. But as far as names, I wouldn't be able to tell you names.
Q. So from a picture and a one-week training course you're testifying that's the same type of symbolic plant in this case?
A. Yes, ma'am.
Q. But you don't know the name of it?
A. No, ma'am.
Q. And that's your testimony that that plant looked fresh to you?
A. Freshly cut, drying out.
Q. How do you know it was freshly cut?
A. Because it wasn't dead yet. I mean, I'm not a gardener but I know a dead plant from a live one.
2 R.R. 92-93.

Q. And what are these branches called that you considered to be good luck charms?
A. [Trooper García] I don't know what they're called. I have no idea what they're called.
Q. What type of training have you had to know that branches are a good luck charm?
A. No training, just some experience. It's very consistent with drug traffickers, people that are running illegal immigrants. There is a pattern. And within the five years I've accumulated such knowledge. That's what I'm using.
Q. Is it always the same type of plant?
A. No, it's not the same type of plant.
Q. Do you know what religion that is that uses the plant as a good luck charm?
A. No, I don't.
2 R.R. 137-38.

recently. These three "circumstances" are actually only one. The evidence supports a conclusion that the tire had recently been attached to the vehicle. A tire that had been washed or was new or recapped would be clean, it would have lubricant on it because it would have been put on the rim recently, and one cannot store a tire on the underside of a vehicle without lowering (and raising) the retention mechanism.

The relevant information about the tire is that it is much older than the model year of the vehicle, making it unlikely that it was a replacement for an original tire that had been damaged. Also, the tires on the vehicle are 16 inches in diameter, while the suspect tire is 17 inches in diameter and would not have been useful in case of a flat. This is perhaps the only evidence that unequivocally points to illegal activity.

Not mentioned in the Court's opinion is Trooper García's testimony that he had previously encountered appellant in Live Oak County.

Q. Prior to August 24th, 2013 had you seen Genaro Acosta in that same vehicle?
A. Yes, sir.
Q. Approximately when did you see Mr. Acosta driving that same vehicle?
A. I believe it was three months prior to this stop.

2 R.R. 124.

That circumstance could be significant and relevant, or not, depending on where appellant lived and where in Live Oak County Trooper García saw him.

In sum, the cumulative weight of the evidence may be sufficient to support appellant's conviction, but the trial testimony was fraught with both assumptions that were based more on personal belief rather than factual information and omissions of relevant information, such as how appellant's employment status was verified and the apparent lack of investigation of the owner of the vehicle. If this Court is going to affirm a conviction, its opinion should set out solid factual and

legal bases for doing so and be sufficiently detailed to support those bases.

I concur in the judgment of the Court.

Filed: November 23, 2016
Do not publish